You'll hear argument first this morning case 1895-26 McGirt v. Oklahoma. Mr. Gershengorn? Mr. Chief Justice, and may it please the Court, this case is resolved by the fundamental proposition that decisions about sovereign rights are for Congress to make, and Congress makes those decisions by speaking clearly in the text. The decision below must be reversed because the text makes clear that Congress never terminated the Creek Reservation and never transferred federal criminal jurisdiction to Oklahoma. I have four basic points to make this morning. First, the Creek Nation had a reservation. The relevant treaties reserved the lands from sale and solemnly guaranteed the lands for the Creek to govern. The text of both treaties and statutes expressly identified the Creek land as a reservation. Nothing more was needed. Second, Congress did not disestablish that reservation. Indeed, Congress considered hallmark language of disestablishment and rejected it. Congress initially sought cession, yet instead provided only for allotment. Then, when congressional inaction would have dissolved the tribe, Congress instead preserved the tribe and its government for all purposes authorized by law. They did so against the backdrop of existing tribal authority to legislate over reservation land. Those congressional judgments should be respected. Third, Congress did not transfer criminal jurisdiction to Oklahoma. At statehood, the Major Crimes Act established exclusive federal jurisdiction over enumerated crimes in, quote, any state of the United States. When Congress overrides the Major Crimes Act and transfers jurisdiction to a state, it does so expressly and it did not do so here. Finally, Oklahoma's rhetoric about disruption does not change the result. On the criminal side, this court's decision in Ramos is a complete answer. On the civil side, the main issues are tax and other regulatory issues that are routinely resolved by tribal state agreements. In any event, Parker makes clear that questions of sovereignty are distinct from claims of reservation status. This court should resolve the reservation question, leaving jurisdictional disputes to Congress, the relevant sovereign, and then for this court to resolve if and when they arise. The state argues that the territory should be analyzed as a dependent Indian community under 1151 and not as a reservation. They base this argument on our decisions in Sandoval and Creek Nation and 1151 itself and the fact that the Creeks have always maintained, been adamant about the fact that they are not reservation Indians. You refer, of course, to the many times in which the treaty is referred to as a reservation, but what is your answer to the state's analysis of our precedent? Your Honor, I think both the precedent and the language support the idea that this is not a dependent Indian community. What this court said in Veneti and what then Judge Gorsuch said in Hydro Resources is that the dependent Indian community label is a catchall for tribes that did not have a reservation and are not on restricted lands. The best evidence of what Congress thought about whether Creek lands were a reservation under the statute is that Congress referred to those lands as a reservation under the statute. With respect to Sandoval and the other cases, it is crystal clear that when Sandoval and those cases are using the term dependent Indian community and that they are describing tribes and other groups that are within Congress's broad power to legislate for tribes broadly. They are not excluding the Creek. Thank you, Counsel. Justice Thomas? Yes, Counsel. In Solemn and in Parker, those cases only involved the disposition of surplus land. And here, of course, there's much, much more being done in a whole series of statutes involving both sovereignty and the allotment of land. Can you point to any case in which we've applied the Solemn fact framework to a case that does as much as is being done in this case? So, Your Honor, I think the key point on the Parker-Solemn analysis is, as Your Honor pointed out in that opinion, that that analysis doesn't derive from anything special about how much work Congress is doing. The reason the Court has always required plain text is because treaty rights are at issue and plain text is required to abrogate treaty rights. And because sovereign rights are at issue and plain text is required to abrogate sovereign rights. So there's nothing magic about Parker and Solemn in terms of whether they're dealing with surplus lands or not. The key point in Parker and Solemn is that plain text is required to do the kinds of transfers that are at issue here. And when you look at the plain text, I think this case is even stronger than Your Honor's opinion in Parker for three main reasons. First, of course, is that the tribe was not absent from the land in the same way that the tribe was in Parker. Second, the land here was allotted almost entirely to the tribal members themselves, to Indians. And third, Congress took steps in 1906 to preserve the tribe. And I guess the thing I would point to, Your Honor, when you ask about whether there are cases like this, I think this is stronger than other cases because the question isn't just what did Congress fail to do. I don't want to interrupt you, but I do want to get this point in that in Parker we were only dealing with one allotment statute that was disposing of surplus land. Here we're dealing with a series of statutes that go both to land, the allotment of land, and to the reduction in the authority of the tribe. That's what I mean. So I understand that, Your Honor, and I think the critical point is that Congress actually preserved the tribe when it had the chance, when inaction would have dissolved the tribe. And so actually I think that makes this stronger than in other cases because Congress took deliberate action when inaction dissolved the tribe. Thank you, Counsel. Thank you, Justice Ginsburg. Counsel, you don't claim immunity in prosecution for a major crime. I think your position is that the federal prosecutors should have charged the client. That's absolutely correct, Your Honor. Federal penalties, as I understand it, are at least as harsh as the state, and in both forms, state and federal, you would have due process protections. So how are you harmed by the fact that you were tried in the state court rather than the federal court when you were exposed to at least the same penalties in both? So, Your Honor, I think the harm flows any time that a criminal defendant is tried by a sovereign that lacks jurisdiction. I don't think that we have ever, that this court has ever said that there's a kind of harmless error analysis when a sovereign asserts jurisdiction, particularly criminal jurisdiction, over a defendant and that you would look to see, well, are the penalties the same? Of course, it is a different set of, I mean, it's a different juror pool. It's a different, it is a different set of potential penalties. And so I guess I don't think that the fact that there would be a rigorous trial in federal court suggests that you would overlook the absence of jurisdiction. Indeed, it seems to me to make this case even easier in some ways because we are not claiming an immunity, as Your Honor pointed out, and indeed there would be a retrial in federal court if the court were to reverse. What makes this case hard is that there have been hundreds, hundreds of prosecutions, some very heinous offenses under state law. On your view, it would all become undone. And if you compare that to the situation in our recent Ramos case where there would be, there's a question about redoing already tried cases, here the Ramos retroactivity appeals in comparison to what is involved here. All have to be done years later when the witnesses may not be there anymore. It's hundreds of cases. So Your Honor, there are hundreds of, there may be hundreds of cases. Actually, in truth, we don't know how many cases this state, which has the numbers, hasn't suggested that there are anything, been able to document there are anything like hundreds of cases, but there are fewer than in Ramos. And in any event, what this court said in Ramos was that that provides no reason to disregard the plain text. To be sure that there will be people... Thank you, counsel. Justice Breyer? Good morning, counsel. Minor point, but one of the arguments, I think, is that whether they're a reservation or not, Congress wanted state courts to try the major state crimes. And in reference to that, I think the government cites Felix Cohen, who was a great expert in this area. And I looked at his letter. He does seem to say that. So if you have any comments about that, about his argument or about that particular aspect of it, I'd like to hear them. So, Your Honor, I think that the law is clear that Congress did not intend for crimes, for tribal crimes to be tried. And I think this is one of the most straightforward statutory construction cases this court will see. The Major Crimes Act at statehood provided that it applied to any state of the United States. There is no exception for Oklahoma, and there was none before or after statehood. Second, what they have pointed to, what the other side has pointed to, is what happened before statehood. And what happened before statehood was that crimes were being prosecuted in the name of the United States in courts set up by Congress applying federal law, which had adopted Arkansas law as the rule of decision. It is the exact opposite of conferring jurisdiction on the states to try. Third, there was nothing in the Enabling Act that would have changed that. Indeed, the Enabling Act sent to federal courts all cases which, had they been committed in a state, would have been subject to federal prosecution. That describes the Major Crimes Act perfectly. And finally, Your Honor, when Congress transfers jurisdiction to a state, it does so expressly. In the gauntlet, which this court described as the first major transfer of jurisdiction, the language used was jurisdiction is conferred. In Public Law 280, the states shall have jurisdiction. In New York, New York shall have jurisdiction. And even with respect to Oklahoma, in 1908, when Congress transferred probate jurisdiction, it said that the Oklahoma courts shall have jurisdiction. Justice Alito? You referred to the Oklahoma Enabling Act. But the language in that is that a case that was pending in the territorial court at the time of statehood would be sent to one of the new federal district courts or to one of the new state courts, depending on where it would have been prosecuted if it had been prosecuted in a state. It doesn't say in a state in Indian country. It says in a state. So isn't the clear meaning of that, that cases in Oklahoma would be treated like cases anyplace else? They treated like anyplace else, meaning it was subject to the Major Crimes Act. So I agree with you that there is no Oklahoma exceptionalism, but I think that cuts exactly in our favor. What Oklahoma is saying is that uniquely among all the states in the Union, it's exempt from the Major Crimes Act. I think the Enabling Act, the language Your Honor is citing, does exactly the opposite. The language says... In the 1897 statute, which said that, quote, the laws of the United States enforced in the territory shall apply to all persons therein irrespective of race. And yet you're saying that cases at the time of statehood would be treated based on race. How can that be consistent with the 1897 Act? Because I think the 1897 Act, Your Honor, extends what the 1897 Act does is extends both U.S. law and the Arkansas law regardless of race. But it did not eliminate any language that was in the Major Crimes Act already. That was a portion of U.S. law. But regardless, Your Honor, of what happened pre-statehood, I mean, we can debate that, but regardless of what happened pre-statehood, there's no disagreement that the Major Crimes Act applies of its own term at statehood. Statehood itself was a major event that transferred, that obviously transferred Oklahoma from a territory to a state. What happened after statehood? Can you cite a single case under the Major Crimes Act that was transferred to or thereafter prosecuted in federal court? No, Your Honor. But this court has made clear that events on the ground don't override the text. What we never interpret criminal statutes to be, what the executive… Counsel, thank you. Justice Sotomayor. Counsel, Justice Ginsburg pointed out that some of the penalties in federal court would be higher than those imposed in state court. Do you disagree that some defendants who might be entitled to raid, if you were to win, some defendants who would be entitled to challenge their convictions would choose not to because the risk would be too high for them? I think that's exactly right, Your Honor. I think that federal penalties will often be higher. I think a number of defendants will have already served large chunks of their sentence. And their ability to seek relief in federal court, at least, will be limited by EDPA. So I think there are reasons to doubt the extent of the state's disruption argument here. And, again, remember the numbers are all in the state's control. And so while we've been hearing, you know, both in the Murphy argument here about, you know, murderers and rapists getting through, in fact, there is no evidence that the state has put forward that they will be in large numbers. And the kinds of habeas petitions that one would expect to see, the kind of tsunami that has been predicted, just hasn't materialized. So I agree with Your Honor's question there. Number two, there's so much discussion about the dependent Indian community. Am I to take it that your argument is that that's almost irrelevant? It is almost irrelevant. It is both wrong and irrelevant. But I'll hit the irrelevant point first. Regardless of what you call it, as my colloquy with Justice Thomas tried to get at, the reason we have a plain text requirement has less to do with whether you call it a reservation or a dependent Indian community and everything to do with the fact that these boundaries were set up by Congress. And so if you are going to undo that, Congress needs to speak, and Congress needs to speak clearly. We're talking about transfers of sovereign rights, and that has to be done clearly in the text. And you can call it a reservation or a dependent Indian community. The test would be the same. Thank you, Counsel. Justice Kagan? If I could pick up on that, Mr. Gershengorn. You said irrelevant and wrong, and the Chief Justice asked you about our two cases, Sandoval and Creek Nation. And I wasn't quite sure I understood your answer to him about how those cases were using the term and whether that is consistent or inconsistent with your argument. So it is consistent with our argument. As I read both Sandoval and Creek Nation, it is using the term dependent Indian community to describe the tribes, basically tribes broadly, that those are communities over which Congress has the power to legislate under its Indian-related powers. In other words, it was not using it in sort of the more narrow and technical sense that Congress did when it enacted the 1948 statute. So in other words— It's supposed to be an umbrella term? That's exactly right, Your Honor. Are standard reservations? Exactly. It includes standard reservations. It includes, but it's not limited to, standard reservations. The whole point— How do we know that? Because that's what the court said in Sandoval, is that it was trying to figure out whether Congress had the power to legislate for the Pueblos, and what it said was Congress had the power to legislate both domestic and old and new communities, and used the term dependent Indian communities. But again, regardless, the tribe has always—the Creek has always been—the reason the Pueblos were compared to the Creek is because the Creek were assumed to be the quintessential reservation. In other words, the fee patent in the Pueblos couldn't be a problem because it wasn't a problem for the Creeks, and everybody understood the Creeks had a reservation. I think that was the sense in which the court was using the term. Thank you, counsel. Justice Gorsuch? Hello? Justice Gorsuch? Thank you, Chief. Counsel, we've heard a little bit about it today, but I'd like to give you a chance to discuss it further. The argument that there are going to be terrible practical consequences that would follow from a ruling for your clients, we can put aside the criminal convictions. You've addressed those. But just the on-the-ground difficulties we've heard about in administering TULSA. A, do you want to respond to that parade of horribles generally? And B, how should that inform our analysis of the interpretation of the statute in a treaty? So, Your Honor, broadly, here's what I would say. There will, of course, be consequences from the court's ruling, as there are from any of the court's ruling. I mean, those consequences are not trivial, but nor are they existential nor, indeed, overly serious. But more important, they are the kinds of consequences that happen routinely in Indian country. They are routinely resolved by agreement in Oklahoma, as Representative Cole's brief indicates, and throughout the nation, as the NCI brief and the experience of Tacoma indicates. And these are routinely addressed by Congress. With respect to how it should influence the text, it should not affect the reading of the text, and that's true for several reasons. First, the text is what the text is, and this court's job is to interpret it. Second, in Parker itself, the court distinguished the two. It separated reservation status from questions of sovereignty and the impact on the ground, and I think this court should take the same approach. Those two questions are distinct. And then, third, it shouldn't affect this court's analysis of the text because Congress is in the best place to change the text and add text if it wants. And, indeed, Congress routinely does in Indian country, and Congress has in Oklahoma. There are Oklahoma-specific statutes that address environmental matters, that ensure that power stays with the state, not the tribe. Congress knows how to do this, and the job to fix any consequences, if the court perceives them, is with Congress. Thank you, Counsel. Justice Kavanaugh? Thank you, Chief, and good morning, Mr. Gersengorn. I want to talk a bit about the history and maybe make a comment, and you and your colleagues can react. But this is not a situation where there's a reservation in an existing state, and Congress has arguably diminished a reservation. This is a case with a territory that, by 1890, Indian territory was predominantly white, about 60% of the population, also a significant black population, about 10%, and about 30% Indian. And the question, as of 1890, how did we get there to that situation? You go back to the treaties of 1832 and 1833 that grant the creeks and the five tribes land. But then the Civil War is key, and the tribes, the five tribes, all align with the Confederacy in the Civil War. The tribes have black slaves, lots of black slaves. And then there's a new treaty in 1866 because the United States is not happy that the tribes have aligned with the Confederacy. Why does that matter for us? Because in that new treaty in 1866, it grants rights of way to railroads. The railroads lead to settlements. The settlements lead to new towns that are predominantly white. So by 1890, you have an odd situation of an Indian territory, nominally, that's predominantly white. So Congress's options at that time are to remove the whites, to remove the Indians. Neither of those was going to happen. So the other remaining options were tribal government over non-Indians, which, of course, is contrary to tradition, or to create a new state. And Congress chose the new state option, it seems, and then had a lot of things that happened over the next 17 years. So I just wanted to get that history out there because I think we're talking about Indian territory and reservations when, in fact, it was 60% white, 10% black, 30% Indian in the relevant territory. Counsel, you have time for a very brief comment? I'll just say very briefly, Your Honor, after statehood, 85% of the Indian territory remained in Indian hands, immune from taxation. The idea that statehood and reservation status are inconsistent is refuted by the fact that Tennessee was 75% reservation at statehood. At statehood in South Dakota, it was 47% reservation. I think Your Honor's sense of the history and the incompatibility of reservations with statehood is not historically accurate. Thank you, Counsel. Mr. Congee? Thank you, Mr. Chief Justice, and may it please the Court, I would like to go straight to Justice Thomas' question about the governing framework here and make three points. First, there is nothing radical about the Parker-Solom framework. It's used to ordinary principles of statutory construction and fundamental principles regarding the separation of powers. The state can't win under that test, and hence it has advocated various amorphous alternatives. I think, Justice Thomas, nothing about the fact that there was a series of statutes here changes the fundamental principles that should apply. There are, to answer your question directly, other cases that have involved a series of statutes. The Mass case involved a tremendous amount about the history of California, a series of statutes and executive orders over time. Solom involved the creation of a reservation only eight months before statehood. Every state likes to claim that its history is exceptional, but there's nothing about Oklahoma here that should cause a divergence from this Court's test. Thank you, Counsel. I'd like to return to Justice Alito's question. Congress passed legislation at the turn of the prior century saying that the United States laws and the laws of Arkansas, which would be applied in Oklahoma, would apply to all persons therein irrespective of race. Now, if you prevail, the laws in the eastern half of Oklahoma will be different. The applicable law will be different dependent upon race. So how is that consistent with Congress's legislation? Thank you, Mr. Chief Justice. It's a critical question. What the 1897 statute did was to apply federal law irrespective of race, the territorial law and Arkansas law as assimilated. There was nothing radical about that. Under the General Crimes Act and the Assimilated Crimes Act, state law was often applied where federal law did not exist. But then what happens, of course, is this watershed moment of statehood, and statehood always changes the status quo. And when it comes to Indians, what it does typically is reserves federal power over the Indians while, of course, giving state power over non-Indians to the states. And there's nothing in the Enabling Act or the Five Tribes Act that suggests that that status quo, the normal way of dealing with it, was supposed to be departed from. I would like an answer to the precise question, which is law would be different in eastern Oklahoma depending upon race, right? Well, under the Enabling Act, yes, the transfer to the state was of cases that would arise under state law, with the federal courts retained with cases arising under federal law. And that, of course, included the Major Crimes Act and the General Crimes Act. Thank you, counsel. Justice Thomas? Yes, Mr. Kanji, brief question. And this is just – it's not necessarily dispositive of this case, but I'm interested in your answer. Do you think a tribe can be effectively divested of title to its land and its sovereignty and still retain the status of reservation? It's a critically interesting question, Your Honor. All disestablishment cases involve a transformation of title, whether we are talking about trust cases or fee cases. Congress was getting rid of communal title and transferring title to individuals. So the question this court has always asked in that regard is whether Congress also must go beyond that and alter reservation boundaries. And here, where we simply are talking about the allotment and the opening up of small town sites to non-Indian settlers, that falls squarely into the rubric that this court has designed where reservations have remained intact. With respect to sovereignty, if a sovereignty was to be completely divested and that's not what happened here, but if it was, I think the question this court would ask is whether the federal government still meant to maintain the reservation for its own purposes. If it didn't, then the reservation would dissolve. Here, if the tribe had been dissolved, the treaties make very clear that the reservation itself would have evaporated. And I understand this is not the premise of your question. That is not what took place here. The 1901 and 1906 Acts clearly maintained a quantum of tribal governmental power. Thank you. Justice Ginsburg? If you are right, in what becomes of all the state-tribal cooperative agreements that we're told about, if the state lacks authority to apply its own law to the increased territory remaining at this session, then everything except what was civil war. All of this, we're told that there are many, many state-tribal cooperative agreements. But if the state lacks authority to apply its own law, what becomes of all those state-tribe cooperative agreements? The agreements, Your Honor, will remain in full force and effect, and this is critical. If we prevail, state law does not evaporate from the reservation. Under this court's doctrines, state law applies in many situations with respect to, especially with respect to the non-Indians in the area, and that's what leads to these cooperative agreements. Reservations involve the different jurisdictions all having authority, and that has been the premise of shared jurisdiction that's underpinned these cooperative agreements. And the best thing I can point you to is not my words, but the words of Congressman Cole's brief, and that's a remarkable brief. I think very few briefs like that have been filed in this court in the area of state-tribal relations, where you have senior members of Congress, former governors, former state legislators saying, please do not disestablish this reservation because the exercise of tribal sovereignty in cooperation with the state has underpinned these agreements. And the authors of that brief were the authors of many of the agreements on the state side, and it's this premise of shared jurisdiction that has allowed for shared governance in Oklahoma to the benefit of all citizens there. Thank you. Thank you, counsel. Justice Breyer? I'm still interested in this claim the state makes that whether it's a reservation or not a reservation is beside the point. But all we have to decide here is whether Congress gave to a state court the power to try the state criminal crime. And Felix Cohn points to three things where he thinks the answer to that question is yes, seems to. First, they abolished tribal courts and put the criminal jurisdiction in the Indian court, the Indian territory courts, which were federal courts. Then in the 1906 Act, it says that those territorial courts, which were federal, have the power to try state law cases. Now, they're not called state law cases then. They're called laws of the Territory of Oklahoma. And then in the 1907 Act, which is after the Enabling Act, it says all causes, civil or criminal, shall be proceeded with, held and determined by the courts of the state coming about, the successors of the district courts of the Territory of Oklahoma and the United States Courts of the Indian Territory. So it's rather ambiguous, this last thing. But given the practice and given Felix Cohn and given you could read it that way, what do you think? Your Honor, it would make my life much easier in this case if I could say there was plain text that had transferred jurisdiction of the state over the Indians. As you know, there would be nothing inconsistent with that in reservation status, but we simply can't find that text. I think the operative text, as Justice Alito said, ends up being the amended Section 16 of the Enabling Act. Prosecutions for all crimes, which had they been committed in the state, would have been cognizable in the federal courts. Justice Alito? Justice Alito? Justice Sotomayor? Counsel, could you finish your answer to Justice Breyer, please? Absolutely, Justice Sotomayor. The cases that would have been cognizable in federal court if Oklahoma had been a state included prosecutions under the Major Crimes Act or the General Crimes Act. The Enabling Act is very clearly saying that those are to be transferred to federal court. As to the practice, this is critical. Nationwide, around the nation, states were irrigating criminal jurisdiction to themselves and the federal government was advocating it, even in cases where the reservations clearly remained intact. The Enabling Act that happened in South Dakota, the Solemn case that happened in Nebraska, the Parker case that happened in Washington State, the Seymour case that happened in Mississippi, the United States v. John case. In all four of those cases, this court unanimously, across different areas, different compositions of this court, paid no heed to that practice. For this fundamental reason, the acts of executive branch officials cannot subvert the will of Congress. Those acts of executive branch officials do not run the gauntlet of bicameralism and presentment. And here is all the more reason not to pay those heed. We know that federal officials were subverting the will of Congress in Oklahoma. After statehood, they would not allow the Creep Nation to hold elections for its chief, its national counsel, even though the Five Tribes Act clearly preserved those powers. So why we should pay heed to the acts of federal officials when they were clearly acting illegally is something that the state has never explained. Counsel, could we go back to Justice Thomas' question? Am I to understand that in existing reservations outside of this Creep Nation issue, there are fee-simple possessions by non-Indians? Non-Indians are living, working on those reservations. And am I to understand there's concurrent federal, state, and Indian jurisdiction over many of the issues involved with those people? Correct, Your Honor. Wherever there's fee-simple land in a reservation, there is concurrent jurisdiction. So you really can't tie... So, Justice Alito? Am I correct that more than 90% of people who live in the area directly affected by this case are not members of the Creep Tribe? That is correct, Your Honor. Well, what would you say to those people if we decide this case in their favor? Won't they be surprised to learn that they are living on a reservation and that they are now subject to laws imposed by a body that is not accountable to them in any way? There are a number of responses, Your Honor. First, very little will change for them. Certainly very little to the bad will change for them. They will largely remain subject to state law. They will benefit in significant ways from reservation status. Justice Breyer asked a question at the last argument about the Tulsa businessman. Well, that businessman could wake up the day after the argument and qualify for enterprise grants that attach to reservation status. What will be the extent of the tribe's authority over these non-Indians? For example, if any member of the tribe has a contract dispute with a non-member, say it's about an employment contract or a lease or the purchase of goods, will the tribal member be able to sue the non-Indian in tribal court under tribal law? No, Your Honor. Assuming that this takes place on fee lands, which is, as you've noted, the majority of lands within the reservation under this court's precedence, it's clear that absent affirmative consent, no, that case would proceed in state court. The tribe presumptively, tribal law presumptively, would not apply to non-Indians with respect to activities taking place on fee land. Well, if this were a different reservation and a non-Indian chose to do business there, knew that he or she was entering a reservation and was doing business there, that would be considered to be consent, would it not? Well, this court's precedence are honestly a little unclear on that, but if there was some form of affirmative expression of consent, that would bring the case within tribal jurisdiction. Justice Kagan? Mr. Kennedy, could I ask you to continue, and you're talking about the consequences of this, and focus particularly about adoptions and foster care proceedings, because I know there's been some concern about that. Thank you, Your Honor. There's been some, frankly, rhetoric about that, but it's misplaced. On the ground, the state agency, the Health and Human Services Agency, and the nation cooperate in every ICWA case. They have a terrific relationship, and they have both been involved in the placement of Indian children. That will not change if the reservation boundaries are affirmed. There are various mechanisms to formalize those agreements. Section 1919 allows the state and the nation to continue sharing jurisdiction for the state courts to retain jurisdiction where there are existing placements, or under Section 1915 for the nation to ordain those placements. There is simply no cause to think that existing placements will be disrupted. That is not in the interest of the nation, the parents, or the children, and it will not happen. With respect to all of these disruption questions, what role do you think that our decision in City of Sherrill plays? Sherrill is always in the room when the states and the tribes are negotiating agreements. It's really, honestly, a thumb on the scale on the side of the states. When it comes to all the fabric of cooperative agreements we have in place currently, those will continue. We have terrific working relationships, as the Cold Brief exemplifies, and it will continue to play that role. Now, if there were ever a situation where the nation were to assert sovereignty in a way that went beyond the bounds of those agreements and that the state took umbrage with, Sherrill is an arsenal that the states can employ in those situations. But what Sherrill makes very clear is that there's a clear distinction between reservation boundaries and whether they exist or not, and what equitable defenses might apply to the assertion of tribal authority within those boundaries. Justice Gorsuch? Counsel, there's been a fair amount of discussion so far this morning about the Oklahoma Enabling Act and the suggestion that it's inconceivable that Congress would have admitted a new state to the Union where a significant portion of the state would have been a federal reservation subject to the Major Crimes Act. I'm not sure we've given you all a fair chance to have at that, so I'd appreciate a thorough response to that question. Thank you, Justice Gorsuch. There's nothing inconsistent between the advent of statehood and reservation boundaries. The Solemn case makes that patently clear. The Cheyenne River Reservation and the Rosebud Sioux Reservation were ordained eight months before statehood. They accounted for about 10% of the state's landmass alone. Congress clearly understood at this time that states could come into being with significant reservation mass. As Arizona became a state shortly after Oklahoma, that was 27% of the state's landmass. This court by that time had recognized that state jurisdiction in the criminal area and the civil area could pertain to non-Indians on reservations and had established this framework of concurrent jurisdiction that still persists to today. Thank you, counsel. Justice Kavanaugh. Thank you, Chief Justice, and good morning. As I mentioned in the last comment, I think we have to understand what the situation was as of 1890 to understand the text of these statutes, but I want to focus on the text, in particular the text of the statute that abolishes the tribal courts and the text of the statute that creates, in essence, municipal towns within Indian Territory during the 1890s and what the significance of those two statutes are for assessing sovereignty, because ultimately the question, as Justice Thomas suggested, I think, is what's the status of legislative, executive, and judicial power? How should we think about those statutes with the tribal courts and the municipal towns? Mr. Chief Justice, I need just one minute to answer this question because it's critical, and it's an excellent question, Justice Kavanaugh. That's exactly how much time you have. Thank you. With respect to the courts, it's critical to remember most tribes did not have tribal courts at this period of time. It was a rarity that the five tribes did. So in restricting and then eliminating those tribal courts, Congress was merely putting them on the same plane as other tribes. And then more generally speaking, with respect to the quantum of governmental powers, as you know, Justice Kavanaugh, Congress has regularly adjusted the meets and bounds of tribal sovereignty. That's what this court recognized in Lara, but has never equated the quantum of power with the existence of the reservations themselves. On the tribal courts point, the difference, I think, some would say, is that the other tribes were not governing a jurisdiction that was predominantly non-Indian, which is what was going on here. Any reaction to that? Yes. Look at exactly what happened in 1901 and thereafter with the Allotment Act. The tribal courts were gone, but the Secretary of the Interior continued to enforce the tribe's legislative authority. Section 42 made it very clear that that legislative authority persisted. The Secretary enforced the tribal laws, and this court's decision in Hitchcock and the Eighth Circuit's decision in Buster make it crystal clear that the tribe's legislative authority persisted after the act in question were enacted. Thank you. Thank you, Counsel. General Mansinghani. Thank you, Mr. Chief Justice, and may it please the Court. Oklahoma has jurisdiction over the eastern half of the state because it never was reservation land and is certainly not reservation land today. To start, the land was not public land reserved from sale, where title remains with the United States, but instead patented in fee to the Creek Nation. That is why this court in U.S.C. Creek Nation called it a former dependent Indian community. And under Venati, it clearly lost that status when the fee patent was dismantled. Now, assuming the land was a reservation, Congress stripped away all semblance of reservation status. Spallum asks us whether Congress's purpose was to divest the tribe of all its interest in the land. And here, statute after statute did precisely that. The Curtis Act ended tribal governance of the land, the allotment agreement divested the tribe of all its right, title, and interest, and even allotments were quickly stripped of federal superintendence. Everyone at the time read these statutes to mean the state had jurisdiction and the land was not a reservation. Thank you, Counsel. Mr. Gershengorn, in response to a question from Justice Kagan, argued that dependent Indian community was an umbrella term that included reservation. I'd like to get your response to that. I think that definition would completely make 1151B surplusage. It would read it right out of the statute. What this court said in Venati is that tribes with land and sea are, quote, unalike Indians living on reservations, citing Sandoval, which compares the Pueblos, who had a dependent Indian community, as essentially the same as the five tribes. And in Creek Nation, this court said that the five tribes had a sea symbol, not the usual Indian right of occupancy, which is what is typical of reservations, and it was a dependent Indian community. And then Congress went out and codified Sandoval as a type of land status separate and apart from reservations, which is what this court held in Venati. Thank you, Counsel. Justice Thomas? Yes. Counsel, I'm very interested in your point that we should characterize this as a dependent nation. First, I'd like you first to say why you think that and why it matters. Opposing Counsel seems to think that it's irrelevant, and as he said, as I recall, that it's also wrong, your assessment of that. So it gives you an opportunity to both respond to that and to explain to us why it is important. So why is it a dependent Indian community? First, as I said, Venati said that tribes with holding their land under a restricted fee are unlike Indians living on reservations. Sandoval and Creek Nation confirmed that. And as far as it doesn't meet the definition of a reservation, I'll take the definition from Hagan v. Utah, land belonging to the United States that is reserved from sale and set apart for public uses. And in Pine River, this court said reserved from sale means the fee remains in the United States. Well, issuing a fee patent is not reserved from sale. It's selling it. Why it makes sense. Making land alienable to non-Indians in a dependent Indian community ends the dependent Indian community status. That's what this court said in Venati, and that's what Judge Gorsuch at the 10th Circuit said in Hydro Resources on page 1163 and footnotes 11 and 30 of his opinion. And that makes textual and logical sense because there's a textual difference between 1151A, which says that a reservation remains one, notwithstanding the issuance of any patent, and 1151B, which doesn't contain that language and defines dependent Indian communities. Again, Judge Gorsuch pointed that out in Hydro Resources. It also makes logical sense because if what created the land was the fee patent, the opposite of that, the conveyance of the fee patent, it disestablishes. That's in accordance with this court's decision in Hagan v. Utah, where it said reservation is reserving land from the public domain, so restoring land to the public domain ends the reservation. Justice Ginsburg? If the reservation had been disestablished, would the tribe have any governing authority? And if so, over what? Would the Major Crimes Act apply or would exclusive prosecutorial authority apply in the state courts? The tribe would have their government in that they would have control over their own internal affairs and managing their property interests, which if you look to the tribal understanding at the time, as you quote in our respondent's appendix, is exactly what the tribe understood their own authority to be. As far as would they have any authority over land, there is some land that is under their original fee patent. So the River Spirit Casino in Tulsa is built on the riverbed of the Arkansas River because that land was never allotted. So they have governing authority over that land, over trust land, and over restricted allotments, but we think the state nonetheless has jurisdiction over all of the state pursuant to the transfer of state jurisdiction in the Enabling Act, which what Congress had done in the Indian Territory, say the Indian Territory is an area where Indians and non-Indians are treated alike, and the Enabling Act in Section 21 extended federal law except where locally inapplicable. And the Major Crimes Act was locally inapplicable in the Indian Territory because the 1897 Act is the act that conferred jurisdiction, not the Major Crimes Act, which is why a petitioner can't cite a single Major Crimes Act case during this period, before statehood or after. This question was asked before, but what of the congressional prescriptions that in Oklahoma all residents are subject to the same law irrespective of race? I think that lays the framework of what Congress was trying to do in creating the state of Oklahoma, which was to transform the governance of the state and the land ownership of the state, which was exclusively tribal, to a place where both Indians and non-Indians could both own land and be governed by the same state government. If you look at pages 22 to 25 of our brief, we lay out that history and lay out that that is what Congress said explicitly in legislative reports, that's what the Dallas Commission report said, and that's what the tribes recognized in their own tribal understanding. Justice Breyer. No, thank you. I'll pass. Justice Alito. Justice Alito. Yes. Mr. Gershengorn has a section of his brief that's labeled The Sky Is Not Falling, and his argument is that you and the federal government are exaggerating the effect of this decision, that it won't have such a major impact either in the criminal or in the civil area. Is he right in that? No, Justice Alito. So let me put some solid numbers on this. We have currently over 1,700 inmates whose crimes were committed in the former Indian Territory who identify as Native Americans. So the state presumptively would not have jurisdiction over those people and have to release them. And that is probably half the actual number because it doesn't include crimes committed against Indians, which the state would not have jurisdiction over. So we're talking here about potentially around 30, over 3,000 inmates we may have to turn over. As far as future cases go, there were 32,000 felonies committed in the former Indian Territory, an area that is about 12% Native American. So only including crimes committed by Native Americans, that'd be 4,000 new felonies a year that the federal government would have to prosecute, including crimes where the Native American is the victim. You can take that to about 8,000. On the civil side, what happens is it creates precisely the differential legal treatment between non-Indians and Indians that Congress tried to abolish when it created the state of Oklahoma. So non-Indians would not be subject presumptively to state zoning law, to dog law, as Justice Breyer mentioned. And that creates a disparity between Indians and non-Indians. So now non-Indian businesses are competing on an unequal playing field with Indian businesses. That's just one example. The Tulsa Brief points out examples on restricted allotments, how Indians are erecting billboards in residential neighborhoods or selling fireworks in them. But that's in the few areas, the 2% of land that remains restricted allotment. If the entire area is a reservation, then you're creating the two separate societies that Congress has sought to abolish when it passed the dozen statutes it did in creating Oklahoma. Justice Sotomayor? Counsel, with the latter part of all of the parade of horribles that you set forth, Congress can come in and change all of that. Congress can give the state jurisdiction over anything it might be missing if we were to hold this was a reservation. They have done so with respect to many other reservations across the country. So this is easily fixable by Congress. Putting that aside, what do we do with the treaty language here that resulted after the Trail of Tears with the Creep Nation? That nation was wrenched from its homeland, marched to Oklahoma, and then given a treaty as recompense which guaranteed its sovereignty. I'm not sure that there's any other dependent Indian community that depends on a treaty right that extends or recognizes sovereignty. So can you point to any? Number one. Number two, if there isn't, why aren't we back in Solomon and Parker? Is there anything explicitly that terminated the reservation in the history that you've recounted? Let me try to take those questions in order. Congress can't fix the retroactive consequences here. As far as the dependent Indian community, I think the Pueblos have sovereignty over their land. It may not have been via treaty, but the idea that the dependent Indian community versus reservation turns on treaty rights is actually nowhere present in this court's case law. And on top of that, the petitioner's position would actually undermine lots of reservations that were not created by treaty, but by executive order. So petitioner's position would actually undermine Indian country around the country. And then third, as far as specific language, I think I'm going to go to Justice Thomas's point, which is cession, as this court said in Rosebud Sioux, means the surrender of territory or jurisdiction. And here you have the explicit surrender of territory and jurisdiction. The Curtis Act said tribal law shall not be enforced. The allotment agreement said all right title and interest is divested. You combine those two things together, that's enough to say that there was no reservation status. But on top of that, you have a bunch of other statutes that do even more things than that that make it absolutely clear. Justice Kagan? General, if we could go back to this dependent Indian community question, which is a complicated one, because, of course, our use of language can change over such an extended period of time. But when I look back at some of these cases that were decided around the same time the Creek Nation was decided, it seems as though the case for Mr. Gershengorn's view, which is that this term was meant to be an umbrella term, is a pretty strong one. And specifically, a case called McGowan, which relied on another case called Pelican, talked about the broad use of the term dependent Indian community and said that whether something was a reservation or a colony was irrelevant because both were dependent Indian communities. And then Felix Cohen says in his treatise, speaking of these cases, he says, and I'm quoting here, all Indian reservations are also dependent Indian communities unless they are uninhabited. So could you comment on that? I think you have to read it as well, taking into account Venati, which says that tribes with their land in fee are unlike Indians living on reservations. I don't think you could read 1151B as just completely the same as what's in 1151A and C. But more than that, a reservation has to be land reserved from sale. And here, the land wasn't reserved from sale. It was sold. It was given to the Creek Nation in exchange for their lands in fee simple. So if you read- Well, that's a different kind of argument. Excuse me, General. That's a different kind of argument. That's the argument that fee simple is itself inconsistent with reservation status. And aren't there other tribes that also have been given land in fee simple that have been recognized as reservations? No, and thank you for the opportunity to address that. So the Creek Nation points to the Seneca in New York as having fee simple, but they yielded their land not by cession, but by selling all their right to private parties in 1797 and in 1842. So under their theory, all of western New York and the city of Buffalo is still an Indian reservation, which would be highly disruptive. They also point to the Wyandotte in 1817 treaty, but they neglect to mention the 1818 supplemental treaty that relinquished the right to a patent and instead gave them a reservation. So our position would disrupt no land anywhere. And in 2015, by the way, the Second Circuit looked at the Seneca's restricted fee land in the Buffalo area, and it said, you know what it is? It's a dependent Indian community. Thank you, Counsel. Justice Gorsuch? Counsel, I have four questions. I'm going to tick them off as fast as I can. And you can choose which ones you want to respond to in the time you have. First, can you explain to me why the fact that the land is in fee simple would lead to a less stringent disestablishment test than solemn? I guess I don't understand why that would be the case. Second, at least in the briefs, you make a lot of later demographics and evidence about what's happened. I guess I'm struggling to think why that should be relevant in an interpretation of statutes from the last century, especially when later demographic evidence sometimes shows nothing more than that states have violated Native American rights, including Oklahoma's, for example, enforcement of its state laws on tribal lands against tribal members in the past. And then third, practical impossibility arguments. If you could address what's wrong with what is in the brief by Robert Henry about how states often work with tribal entities. And then finally, fourth, I would have thought that after Carpenter versus Murphy, we might have seen a tsunami of cases if there were a real problem here that we haven't seen. So any of those you want to take up, feel free. I'll do my best, Justice Gorsuch. Why does it mean less protection? We're not saying it's less protection or more protection. That is a false paradigm. Congressional intent controls regardless. 1151 is not a sliding scale of protection with reservations of dependent Indian communities being more or less. Now, they did have more rights with respect to the title, which is why Congress decided they needed tribal agreement, but the tribe agreed to divest itself of that title. But when it comes to dependent Indian communities, what you said in Hydro Resources and what Venati said is that dependent Indian communities, when the land becomes alienable, it's no longer part of the dependent Indian community, and that's based on the textual differences between 1151A and 1151B. As far as what happened upon statute, we're not relying on what happened 100 years after statute. We're relying upon the tribal understanding, the federal understanding, the understanding of federal judges during the process and as the process was being implemented. Federal judges at the moment of statute transferred cases involving Indians to tribal, to state courts, and the tribes understood, as we prove in our respondent's appendix, that they would be subject to state law. So what we're talking about here is the original tribal understanding and the original public meaning, and what they're trying to do is impose a modern lawyerly gloss on statutes enacted 100 years ago. So if you look at the original understanding of how everybody implemented it, it is completely as Oklahoma is doing today. The fact that there's no tsunami, we've had 178 people already seek relief under Murphy, even though the Murphy mandate has been stayed and the Oklahoma Court of Criminal Appeals decision is still binding on state courts. So that 178 cases are just the initial cracks in the dam, and that doesn't even include the state court filings that our office isn't notified of. So I don't think that you can say that there's no tsunami coming. And then as far as practical things, yes, we're going to try to work with the tribes as much as we can, regardless of how this decision comes out. We work with the tribes on a day-to-day basis in doing a lot of great things in the state of Oklahoma, but that doesn't stick to the retrospective. Justice Kavanaugh? Thank you, Chief Justice, and good morning, General. I want to pick up on your comment earlier that Congress made clear that Indians and non-Indians were to be treated alike, and to pick up on Justice Gorsuch's reference to demographics and follow up on what I said in my earlier questions. My understanding is that as of 1890, this was a very unusual situation because it was already predominantly non-Indian in Indian territory, and that put Congress in a very difficult position of figuring out what to do. And I think that it's necessary to understand to figure out what the text of these statutes mean. So I guess my question on demographics is, people talk about the demographics now. The demographics in 1890 were also similar. How should that affect what we're thinking about, and more particularly, can you connect that up to the text of the statutes that Congress enacted in that 17-year period to transition to statehood? Certainly, Justice Kavanaugh. I think that's the right way to look at it. By statehood, 90% of the area was non-Indian. And I think what that means is that you have to figure out what Congress was trying to do, which is abundantly clear from the history, which is Congress is trying to undo the tribe's exclusive ownership of the land and exclusive governance of the land because there was no territorial government, to give it to a new state that would govern the land, non-Indians and Indians alike, and where non-Indians and Indians alike would own the land. That is nothing like any of this court's previous cases. Mr. Gershengorn was not able to point to any case that was anything like that. And so how that connects to the statute? Well, if what Congress is trying to do, and this is very clear from the history, Congress was trying to transform both the jurisdiction and the land ownership. Well, the Curtis Act transformed jurisdiction. It says tribal law shall not be enforced. And the allotment agreement transformed the land tenure. Now, the other side says, well, we could still levy taxes. Taxes were affirmatively abolished in the Five Tribes Act, so they can point to no actual tribal power that existed. The one power they can appoint to was abolished in the Five Tribes Act. Thank you, counsel. General Moss, Deputy General Needler. Thank you, Mr. Chief Justice, and may it please the court. In preparing the Indian Territory for statehood, Congress eliminated all the hallmarks of a reservation. Congress broke up the tribe's national domain and extinguished the tribe's interest in it. Congress likewise eliminated the tribe's territorial sovereignty over that area by abolishing tribal courts and prohibiting enforcement of tribal law in territorial courts. At the same time, Congress eliminated the distinct treatment of Indians under federal law and instead subjected all persons in the territory, irrespective of race, to the same courts and body of law largely incorporated from the state law of Arkansas. And Congress carried forward that framework for the new state. It directed that Oklahoma law would apply throughout the former Indian Territory and provided for the transfer of criminal and civil cases involving Indians and non-Indians alike to state court. Congress did not then radically change course and imposed a reservation-based jurisdictional regime throughout eastern Oklahoma upon statehood. Mr. Needler, the creek land was owned by the tribe in communal fee, unlike the situation on most reservations. Could you explain the consequence of that for the analysis in this case? Yeah, I think it's significant, and I think it strongly supports this establishment here. The tribe had fee ownership as part of setting aside the territory for its nation to be undisturbed, and the treaties provided that no territory or state would be created there. So after all the non-Indians moved onto the territory, Congress concluded that was untenable and it had to break up the nation, and that included both the fee and the sovereignty. And so when Congress provided for allotment, the tribe specifically ceded its interest in the land, conveyed its interest in the land to the individuals, and because the fee was the hallmark of their sovereignty, what made them separate, the tribe's own conveyance of the fee to individual members and extinguishment of all interest in it extinguished their sovereignty at the same time. Thank you, Counsel. Justice Thomas? Yes, thank you. Mr. Needler, in Solemn and Parker, we had clear reservations, and it was pretty standard, and then you had an effort to dispose of or to alienate surplus land. Here this is entirely different. Have you seen a case like this in which we have applied the Solemn and Parker framework? I have not, and the point you made earlier that Congress, in all those earlier cases, the court was really trying to discern the consequence of a surplus land act standing alone. Here you have other statutes that specifically address those consequences. Each of those cases arose in deciding whether federal law would apply or state law would apply. Here Congress answered that question directly. There's no need to infer that from a surplus lands act alone. Congress, in preparation for statehood, provided that the same laws would apply to Indians and non-Indians and then turned over a territory with those attributes to the new state. And immediately upon statehood, when that compact of statehood was entered into, the state courts started to exercise jurisdiction over Indians in that territory in fulfillment of Congress's preparation. And that was done pursuant to an act of Congress. It's not simply a consequence of surplus lands. All of that is the consequence of Congress's preparation for statehood. Thank you. Justice Ginsburg? What about statements that an allotment conveying the title and interest of the tribe? An allotment, unlike session, doesn't diminish a reservation. There's no a priori test for that proposition. The important point here is that when Congress started the move towards statehood, the preparation for statehood, it did that in the Dawes Act in 1893. And that act provided for the Dawes Commission to negotiate for session, for allotment, or such other method that could be accomplished in preparation for statehood. Congress regarded whatever method could be worked out as the prelude to statehood. And the reason for prelude to statehood is because Congress was preparing to substitute the state for a territory, just as it has done with all territories in the past. The only difference here was that there was no territorial government separately established. It was the territories and the governments of the tribes, which Congress essentially prevented from enforcing their laws and created a situation where the land, where that characteristic could then be transferred to the state with Indians and non-Indians treated alike. I think this question has been asked before, but when the tribe, not the United States, the tribe holds title to treaty-guaranteed land, you say we should apply a less stringent standard to this establishment. Why? I would think that you anticipate an even smaller showing when it is the tribe itself, not the United States. I'm not saying it's a less standard. It's a less stringent standard. What I'm saying is that what Congress did needs to be understood in the historical framework in which it acted. And the framework, that was understood by everybody concerned at the time of statehood. The compact of statehood that provided for this, was that it wasn't conferring jurisdiction on the state. It was part of the compact under which the state came into the union, that in Eastern Oklahoma, as was prepared for it by Congress, Indians and non-Indians were treated alike. That was the deal, and that was followed through with by transferring cases involving non-Indians. And the fact... Thank you. Thank you. If we decide that SOLEM doesn't apply here or there's an exception, then you would win, I assume. Let's assume that. But would that not cause the same practical problems elsewhere in the country? For 35 years, people have lived under SOLEM. If we change it or make exceptions, won't there be places where people bring lawsuits to people who are in prison and they say we were tried in the wrong court? The same circumstances here? We thought we were a tribe? And the prisoner says, no, you're not a tribe. And vice versa. So why does the parade of horribles work in only one direction? Departing from SOLEM, you get the horribles. Regardless... We think this is a compelling case under SOLEM, but also that the court has to consider the application of SOLEM with respect to the unique history of Oklahoma. There is no other territory of the United States converted to statehood.  My question is if we make an exception from SOLEM or if we change SOLEM, is there not likely to be the same kind of parade of horribles elsewhere? I don't know the history of every tribe in the United States. And though you know a great deal about it, I'm not sure that you do. I'm sorry. No, go ahead. You see the point. If you created an exception to SOLEM, it would be an exception that would no doubt be based on the unique circumstances of this case. Again, unlike in SOLEM and other cases, there's not just the Surplus Lands Act. You have these other specific statutes directed at the consequences of disestablishment, the attributes of disestablishment. And I'm unaware, and we haven't seen in the eight or nine or ten disestablishment cases this court has had, anything resembling that where there are separate statutes implementing... Oh, do you know what happens, say, in Alaska or in Hawaii or in Wyoming? Have you all looked into this and said, if you create an exception and there's no one else who could qualify for that exception? No one has identified. We have not. Of course, in Alaska, there are no reservations at all. In Wyoming, there's one reservation. So nothing like this has surfaced. And again, this has been the case for 100 years in Oklahoma, more than 100 years since Oklahoma entered the Union on the understanding that Indians and non-Indians would be treated alike in the eastern half of that new state. There's nothing like that. Mr. Kneedler, the broad question, whether the Creek Nation has a reservation or whether it's a dependent Indian community, has all sorts of implications. But what I'd like you to address is whether we can decide on this case on a narrow ground, because after all, the only thing that's involved here is a criminal prosecution. So if we were to look at the narrow question, whether Congress has provided for the trial of cases like this one in state court, what would an opinion like that look like? What would it look to? The 1897 Act, the 1906 Enabling Act, and the amendment in 1907, the way these laws have been interpreted for 100 years, what would an opinion like that look like? I think it would look at all those things. And again, what happened prior to statehood is highly relevant because everything Congress did was in preparation for statehood. So the subjecting Indians and non-Indians to the same laws was part of the package that Congress incorporated into the new state of statehood. So the 1897 and 1904 Acts are critical. And the Statehood Act, which provided for the transfer of cases to state jurisdiction, was contemporaneously construed and applied by those responsible for implementing it. What would you say to the argument that we shouldn't look to the way it was interpreted right after statehood or for many decades after that? Because those people were proceeding in bad faith. The statutes were clear, and the state was simply usurping authority, and the federal government was going along with it. There's absolutely no basis for that. These are federal judges, federal district judges, federal Indian court judges, and state court judges, and state court prosecutors, everybody on the ground understood that. There was a case in this court called Hendricks, which proceeded on the assumption that an Indian in the Indian Territory had committed a crime. His case could have been transferred to state court for some special statute that said otherwise, but the premise of the whole case was that his case would have otherwise gone to state court in Oklahoma. And it's important to understand that the tribe understood that, and I urge the court to look at the statements by the principal chief of the Creek Nation in 1906 after the Tribes Act was passed, and he said, upon the establishment of a state government, all powers over the governing even of our land and property will cease, except insofar as the distribution of our property and money is concerned, which will be entirely... Justice Sotomayor? Mr. Kneedler, I understood that statement was in light of the existing congressional disestablishment legislation that Congress subsequently changed and didn't go through with. But putting that aside,  whether you've accepted the Oklahoma's suggestion about the dependent Indian community exception or argument, are you endorsing that argument? Not in terms. We're not. I mean, this court has discussed dependent Indian community separately, but some of what informs the state's argument, we think, is very important, as I said before. But let's go back to, is there a consequence that we're unaware of if we were to describe this creek land as dependent Indian community? What other things would we put in question? You're saying the things that inform that discussion inform your disestablishment. I understand your argument, but why aren't you endorsing the dependent Indian community argument? Well, there could be other situations. I mean, for example, in Oklahoma, Congress has provided for various statutes to apply to tribes within their former reservations. And if these were regarded as dependent Indian communities, would statutes like that apply? Now, Congress still refers to them as former reservations. But one point that I think makes this effect... I hate to cut you off, but I do have one last question here, which is, what do we do if we say this reservation was disestablished? Under what theory would we recognize Indian sovereignty over lands they kept? It was either disestablished or not. And why would all the complex laws that exist now giving the Indians the reservation, the casino rights, and jurisdiction over lands that they own and all of those other things, what would be the basis of keeping all of that? Well, it's... It was disenfranchised. It's commonplace that when a reservation is disestablished, those parcels that remain as allotments or tribal trust land or of the sort remain Indian country. And so saying the reservation was disestablished, which has been the assumption for over 100 years, would not change anything on the ground, because the... And Oklahoma has always been understood that allotments are the fulcrum of tribal and individual activities. Thank you, Mr. Kneedler. Justice Kagan? Mr. Kneedler, I understand you want to support Oklahoma's position in this case, but just to follow up on Justice Sotomayor's questions about what Indian... what dependent Indian communities were or were thought to be in 1935, do you think that those concepts were mutually exclusive, a reservation and a dependent Indian community? Well, I think there was a lot of overlap and, you know, sort of the bottom... The court often described them in general terms as land validly set apart for the use of Indians as such under the superintendence of the government. And that phrase appeared in Pottawatomie in describing the difference between trust and reservations. So the same general concept is there,  as opposed to an allotment, for example, it's owned collectively. And so when the land is broken up, as it was here, particularly when it's sea land that is broken up, and when someone conveys their interest in feed to somebody else, they are conveying all of their interest in it. It's not like trust property on the typical reservation where when it's allotted, the United States retains an interest and therefore, on behalf of the tribe, in some sense, retains an interest. When it's sea land, it is conveyed out of the tribe and the tribe loses all of its interest in the land. And that's particularly clear under this allotment agreement because it provides that the United States also extinguished, by approving the deeds, extinguished its interest in the land. And that interest was a reversionary interest for when the tribe was disappearing. And so by relinquishing the United States' interest in that land, at the same time it was conveyed to the individual Latte, it made it clear that the tribe as sovereign was being, its sovereign authority over that land was being eliminated. Thank you, Mr. Kneedler. Justice Gorsuch? Mr. Kneedler, tell me what's wrong with this sequence of my understanding, that Congress did establish something it called a reservation with respect to this property at some point in time. That through the 1890s and the early part of the last century, there was an awful lot of debate about how to end that reservation, whether they could end it, in anticipation of Oklahoma becoming part of the Union. And then things got very complicated and they became mighty close to ending the reservation, but never quite passed the kind of language that we typically see when that happens. Reversion of all lands to the public domain or cessation or anything like that. In fact, Dawes Commission couldn't, admittedly, couldn't quite get there. And so you're really left to rely mostly on a lot of demographic evidence, both then and now, which, while not everybody's acting in good faith, not everybody's acting in bad faith, too, as some have pointed out. And it's a mixed bag and it's very hard to make much of it and to rely too heavily on demographic evidence is dangerous because you, in some ways, incentivize people to ignore the plain terms of the law. And, for example, as I pointed out earlier, I think it was until the 1970s that Oklahoma continued to try and enforce state law against Native Americans on a lot of territory. I believe I have that right. So tell me what's wrong with that understanding, please. Well, first of all, I think there's a big difference between demographics before and after statehood. The overwhelming presence of non-Indians in the territory was precisely the reason why Congress said it won't work to have tribal governments running this. The tribes couldn't exercise jurisdiction over the non-Indians. So what Congress said is this area needs a government for and by both Indians and non-Indians, and it established that in the territory so that it could hand that over to the new state. And it was this court's decisions say that the contemporaneous understanding of what Congress is doing is significant. The original public meaning of what was done and everybody, the state understood it. The state obviously implemented its compact of statehood. The federal government understood it. Felix Cohen understood it. The Commissioner of Indian Affairs at the time said there's only a one-time rule of the government that tribal government left. The tribal chairman, the tribal chief said the same thing, that all we are in a position to do is distribute the property. And that is, and even the case that petitioners and the tribe rely upon, the Harjo versus Klepe, specifically says that the tribe lost its territorial sovereignty, even though it had the authority to run its internal affairs. So. Thank you, Chief Justice. And good morning, Mr. Needler. I'm going to follow up on a question Justice Sotomayor asked and one Justice Gore suggests. Justice Sotomayor mentioned quite rightly the 1832 and 1833 treaties. My understanding, however, was that the 1866 treaty made clear that those treaty rights were, I don't know if the word is superseded, but diminished because the tribes had aligned and made a treaty with the Confederate States of America and the treaty language in 1866 said that that had unsettled the treaty relations. Anything you want to add on the 1866 treaty, the relevance of that? Yeah, I don't think it adds significantly to the point, except that it reflected an assertion of a greater federal responsibility in the territory. And it was contemplated that Congress could pass laws governing the territory. I did want to make one point about practical consequences on the criminal side. Not only would this jeopardize all the prior convictions on the state side, but it would impose great burdens on the federal government. It's estimated a 1300% increase in criminal prosecution brought in state court. And then, of course, for the state, there would be questions of taxation and whatnot. And I don't think city of Sherrill, which has been suggested as a solution to that. I have another question, Mr. Kneedler, to follow up on Justice Gorsuch. My understanding, given the demographics as of 1890, was that it would be very hard to have a tribal government over the whole territory because of the population at the time. And my question is what tribal authority, judicial authority or legislative authority, to your knowledge, was exercised over the whole territory, including the white settlers in 1890 through 1907? It was that the tribes had no authority over the white settlers, which is why Congress put in place the courts for the Indian territory and put in place federal law, mostly incorporating Arkansas law to govern Indians and non-Indians alike. And that is the regime that Congress passed on from the territory to the new state and the new state received and has been faithfully applying that ever since statehood. Thank you, Mr. Kneedler. Mr. Gershengorn, you have two minutes for rebuttal. Thank you, Mr. Chief Justice. A number of things. Justice Gorsuch, first, you're exactly right. This court may not be able to determine which party has the better reading of events on the ground 120 years ago, but it is surely well positioned to determine which party has a better reading of the text. And on that score, I submit this case is not closed. Second, Justice Ginsburg, two points. With respect to fee title, that was meant to be an additional protection because everyone understood the imperfections in Indian title. The Creek didn't even get their patents until 1852, 20 years after the reservation was given. Elimination of fee title does not eliminate treaty promises. Those have to be disestablished through plain text. In addition, Justice Ginsburg, you're exactly right. The right title and interest language, which is the only text the other side can point to, conveys only proprietary interest, not sovereign interest. And so there is no textual transfer. There has been a lot of talk discussion this morning about irrespective of race. It is one quick point on that. When in the enabling act, in section 13, what Congress put in place was the laws of the territory of Oklahoma, which did not have this supposedly magic language about irrespective of race. That suggests that Congress well understood that the arguments the SG and the Oklahoma are making on this score are made up for today. Fourth, there was a lot of discussion about whether there's a compromise available on criminal jurisdiction. There is not. Justice Alito listed a number of factors from Mr. Needler. One of the missing ones was the text. The text is very clear. I was amazed that Mr. Needler said there was no basis for believing that there was ignoring of the text. Neb Gonset said that is true. Secretary Udall's memo listed seven states in which it were true. Finally, the numbers today are mind-boggling in back of the envelope. They don't appear in any of the briefs. The only fixed number is 178 petitions that dwarfed Ramos. I understand the court's concerns about jurisdictional consequences, but there are no serious disagreements that these disputes are common in Indian country. The case is submitted.